UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE
VERIFIED COMPLAINT

PATRICIA A. GRANT, PhD                          No. C15 1713 JLR
                    Plaintiff

            vs.

STATE OF WASHINGTON ET. AL.
                    Defendants.

**PLAINTIFF'S REPLY TO COURT ORDERED AMENDED COMPLAINT.**

Now comes Ms. Grant filing this amended complaint, to be taken jointly with her original

complaint, and exhibits; whereas, the preponderance of all information supports her claims

against the of State of Washington Judicial and State Defendants, in defense of court dismissal:

**I. INTRODUCTION.**

Ms. Grant's cause of action against the State[1] ("Ferguson and Even") and Judicial[2]

Defendants arose out of her Superior Court complaint of "Medical Profiling"[3] as the bases for

medical neglect as a result of her "Individual Profile" - Black Female, Age 50, 100% Disable

Veteran w/mental and behavioral health disabilities, mental illness stigma attributions, and the

stigma of mental-behavioral health (MIS).

_____

[1] Atty Gen Ferguson and Deputy Atty Gen Even – Jointly ("State Defendants").

[2] Judicial Defendants also referenced by Washington State Courts Judges – King County
Superior Judge ("Judge White"), Court of Appeals Division I  ("Appeals Judges") and Supreme
Court Justices ("Justices").

[3] Medical Profiling – Providing Medical treatment based a biasness preconceptions based on the
individual's medical profile void the required standards of care, examination of medical records,
x-rays, and other required sound medical practices, as sanction under the federal and state
medical laws.

This case[4] " involves a [Mental Illness Stigma (MIS)] suit filed under [American Disability Act ("ADA")] Title II, [V –Ex Parte Young and other appropriate legal authorities]. Title II provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.' 42 U.S.C. 12132. A 'public entity' is defined to include 'any State or local government' and its components. 42 U.S.C. 12131(1)(A) and (B). The term 'disability' is defined as 'a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual'; 'a record of such an impairment' or 'being regarded as having such an impairment.' 42 U.S.C. 12102(2). A 'qualified individual with a disability' is a person 'who, with or without reasonable modifications * * * meets the essential eligibility requirements' for the governmental program or service. 42 U.S.C. 12131(2); 28 C.F.R. 35.140 [ Congress instructed the Attorney General to issue regulations to implement Title II, based on prior regulations promulgated under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794].

The discrimination prohibited by Title II of the Disabilities Act includes, among other things, denying a government benefit to a qualified individual with a disability because of his disability, providing him with a lesser benefit than is given to others, or limiting his enjoyment of the rights and benefits provided to the public at large. See 28 C.F.R. 35.130(b)(1)(i), (iii), (vii). In addition, a public entity must make reasonable modifications in policies, practices, or procedures if the accommodation is necessary to avoid the exclusion of individuals with

_____

[4] Quote: The United States' Supplemental Opposition to Defendants' Second Motion for Summary Judgment. *Frank G. McAleese v. Pennsylvania Department of Corrections, Et. Al,* No. CA99-381 Erie. In the United States District Court for the Western District of Pennsylvania.

disabilities and can be accomplished without imposing an undue financial or administrative burden on the government, or fundamentally altering the nature of the service. See 28 C.F.R. 35.130(b)(7). The Disabilities Act does not normally require a public entity to make its existing physical facilities accessible. Public entities need only ensure that "each service, program or activity, * * * when viewed in its entirety, is readily accessible to and usable by individuals with disabilities," unless to do so would fundamentally alter the program or impose an undue financial or administrative burden. 28 C.F.R. 35.150(a). However, facilities altered or constructed after the effective date of the Act must be made accessible. 28 C.F.R. 35.150(a)(1), 35.151.

Title II may be enforced through private suits against public entities. 42 U.S.C. 12133. Congress expressly abrogated the States' Eleventh Amendment immunity to private suits in federal court. 42 U.S.C. 12202. The discrimination prohibited by Title II of the Disabilities Act includes, among other things, denying a government benefit to a qualified individual with a disability because of his disability, providing him with a lesser benefit than is given to others, or limiting his enjoyment of the rights and benefits provided to the public at large. See 28 C.F.R. 35.130(b)(1)(i), (iii), (vii). In addition, a public entity must make reasonable modifications in policies, practices, or procedures if the accommodation is necessary to avoid the exclusion of individuals with disabilities and can be accomplished without imposing an undue financial or administrative burden on the government, or fundamentally altering the nature of the service. See 28 C.F.R. 35.130(b)(7). The Disabilities Act does not normally require a public entity to make its existing physical facilities accessible. Public entities need only ensure that "each service, program or activity, * * * when viewed in its entirety, is readily accessible to and usable by individuals with disabilities," unless to do so would fundamentally alter the program or impose an undue financial or administrative burden. 28 C.F.R. 35.150(a). However, facilities altered or

3

constructed after the effective date of the Act must be made accessible. 28 C.F.R. 35.150(a) (1), 35.151.

Title II may be enforced, through private suits against public entities. 42 U.S.C. 12133. Congress expressly abrogated the States' Eleventh Amendment immunity to private suits in federal court. 42 U.S.C. 12202".

Ms. Grant appears with complicated legal issues, arising from the stigma[5] and attributions of mental illness[6], due to her 100% disable veteran medical status[7]. She is alleging: A) Discriminatory Judicial Process - Mental Health and Pro Se Litigant, B) Judicial Ruling Contravention of Federal and State Laws, and C) White Washing- Judicial and Political Conflicts of Interest.

---

[5] Mental Illness Attributions (Responsibility, Pity, Anger, Dangerous, Fear, Help, Coercion, Segregation, and Avoidance). Corrigan, P. W., River, L., Lundin, R. K., Penn, D. L, Uphoff-Wasowski, K., Compion, J., . . . Kubiak, M. A. (2001). Three strategies for changing attributions about severe mental illness. *Schizophrenia Bulletin, 27*(2), 187–195.

[6] Mental illness stigma (MIS) - Stigma exists when the following interrelated components converge. In the first component, people distinguish and label human differences. In the second, dominant cultural beliefs link labeled persons to undesirable characteristics—to negative stereotypes. In the third, labeled persons are placed in distinct categories to accomplish some degree of separation of "us" from "them." In the fourth, labeled persons experience status loss and discrimination that lead to unequal outcomes. Stigmatization is entirely contingent on access to social, economic, and political power that allows the identification of differentness, the construction of stereotypes, the separation of labeled persons into distinct categories, and the full execution of disapproval, rejection, exclusion, and discrimination. Thus, we apply the term stigma when elements of labeling, stereotyping, separation, status loss, and discrimination co-occur in a power situation that allows them to unfold (Link & Phelan, 2001, p. 367). (Link, Yang, Phelan, & Collins, 2004, pp. 512-513, and  Grant 2013, p. 10). Link, B. G., Yang, L. H., Phelan, J. C., & Collins, P. Y. (2004). Measuring mental illness stigma. *Schizophrenia Bulletin, 30*(3), 511–541. Grant, P. (2013) Exploring relationships between organizational leadership and mental illness stigma: An exploratory quantitative study. Capella University, 118 pages; 3602468.

[7]Docket #3  Exhibit 1 – Patricia A. Grant DD Form 214 and VA Rating Letter.

## II. ISSUES, FACTS, DISCUSSIONS, ARGUMENTS, AND REMEDIES.

Ms. Grant's court filings –complaints, pleadings, evidence, arguments, and discussions – she openly identified herself as a 100% disable veteran with mental and behavioral health disability, and the victim of the stigma of mental behavioral health medical profiling and placation medical treatment - the nature of her judicial tortfeasor, and medical malpractice - neglect complaints, now before this said court.

Review of Ms. Grant's evidence, taken with her cited federal and state laws, establishes case factual patterns[8], and genuine triable questions of law and fact, exceeding the "plausibility" standards of *Bell Atlantic Corp. v. Twombly* (2007) and *Ashcroft v. Iqbal* (2009)[9]; the judicial disbelief case dismissal standards of *Neitzke v. Williams* 490 US 319, 109 S. Ct. 1827, 104 L. Ed. 2d 338 - Supreme Court, 1989[10]; frivolous case dismissals, and other case dismissal standards under 28 U.S. Code § 1915 (e) 2(A)(B)(i)(ii) (iii) or its predecessor 1915 (d) (1)(2) (3), as follows:

---

[8]Case established factual patterns: Mental health placation medical treatment, failure to treat diagnosed post-gastric bypass hernia, Post gastric-bypass hernia standard of care, questions of judicial misconduct and conflict of interest, denial of mental and behavioral health ADA accommodations request, discriminatory pro-se litigant local practices, and violations of 14th amendment "due process" and "equal justice" as a matter of law.

[9]To survive a motion to dismiss, a complaint must contain **sufficient factual matter**, accepted as true, to **"state a claim to relief that is plausible on its face**." *Id.,* at 570,127 S.Ct. 1955. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to **draw the reasonable inference that the defendant is liable for the misconduct alleged**. *Id.,* at 556, 127 S.Ct. 1955. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of `entitlement to relief.'" *Id.,* at 557,127 S.Ct. 1955. *Ashcroft v. Iqbal.* 129 S. Ct. 1937, 556 US 662, 173 L. Ed. 2d 868 - Supreme Court, 2009.

The Supreme Court "retired . . . the no-set-of-facts test" and replaced it with the plausibility test. Under this "retooled" test, as one court has called it, **"**a complaint must contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face**". *Bell Atlantic Corp. v. Twombly* (2007) and *Ashcroft v. Iqbal* (2009).

[10]"What Rule 12(b)(6) does not countenance are dismissals based on a judge's disbelief of a complaint's factual allegations. District Court judges looking to dismiss claims on such grounds must look elsewhere for legal support. *Neitzke v. Williams* 490 US 319, 109 S. Ct. 1827, 104 L. Ed. 2d 338 - Supreme Court, 1989.

**A. Discriminatory Judicial Process - Mental Health and Pro Se Litigant:**

**Issue 1:** To determine, if mental and behavioral health confirmation biasness[11]; and individual[12], structural, or institutionalized[13] mental health discrimination, forms the bases for Judicial Defendant's case dismissals; and whether Ms. Grant's veterans status, medical profile, and the subject of her complaint- "Medical Profiling" malpractice and negligence, conspiring and defamation - emanating from the stigma, attributions, and discrimination of mental illness - are also contributing factors to her court entry denials.

**Fact 1:** Washington State's Minority and Justice Commission posts, online, numerous studies addressing racial biasness, perceptions, and other race related issues, excluding mental illness stigma related data. Over the past 10-years, this Commission has not published judicial research, addressing mental and behavioral health disparities, perceptions, or other civil rights related issues- pertaining to this important subsector of today's society.

_____

[11] Confirmation Biasness  – The interpretation of information so that it forms to one's own preconception of an occurrence, person, event or phenomenon.

[12] Individual discrimination – The discrimination against one person by another, whereas negative opinions (social, economic, political, or other) of individual members in one societal subgroup, creates a disparity harming another individual in the same or different subgroup i.e. Appeal Judges composed of three males, two of the same race as Ms. Grant, and the Supreme Court Justices diversity composition, also reflects the multi- protect class status of Ms. Grant.

[13] Structural or Institutionalized  discrimination (also known as structural inequality, systemic discrimination, or institutional racism) occurs within organizational systems with individualized rules and practices that disadvantages less empowered individuals; such as pro se pro se litigants,  or groups, such as individuals with mental and behavioral health disabilities, while simultaneously providing an  advantage for the dominant group i.e. judicial defendant's "pro se – attorney same standard local practice".

**Fact 2:** Superior Court's mental health ADA accommodations are unpublished, inadequate, ineffective, dehumanizing, and intrusive invasions of privacy. Judicial Defendant's mental health ADA accommodations are lackadaisical and non-enforced measurements, raising on where these accommodations meet federal legal standards.

**Fact 3:** November 2015, and March 2013 Judge White's, judicial behavior and statements, directed at Ms. Grant, epitomizes Mentalism or Sanism[14].

**Fact 4:** Medical Defendants argued "Medical Exclusivity" [15] in defense of Ms. Grant's civil rights allegations, and took issue with her charging defendant Mr. Thirlby, MD with racial and mental health discrimination. Judicial Defendants failed in their duty of objectivity by upholding medical "Exclusivity," as a civil rights case dismissal defense.

_____

[14]"Mentalism or Sanism is a form of discrimination and oppression because of a mental trait or condition a person has, or is judged to have. This may or may not be described in terms of mental disorder or disability. The discrimination is based on numerous factors such as: stereotypes about neurodivergence (e.g. autism, ADHD, bipolar, schizophrenia, personality disorder diagnoses), specific behavioral phenomena (e.g. stuttering, tics), or supposed intelligence.

Like other "isms" such as sexism and racism, mentalism involves multiple intersecting oppressions and complex social inequalities and imbalances of power. It can result in covert discrimination by multiple, small insults and indignities. It is characterized by judgments of another person's perceived mental health status. These judgments are followed by actions such as blatant, overt discrimination (refusal of service, denying of human rights). Mentalism impacts how individuals are treated by the general public, by mental health professionals, and by institutions, including the legal system. The negative attitudes may also be internalized.

The terms mentalism (from mental) and sanism (from sane) have some widespread use, though concepts such as social stigma, and in some cases ableism, may be used in similar but not identical ways. While mentalism and sanism are used interchangeably, sanism is becoming predominant in certain circles, such as academics, those who identify as mad and mad advocates and in a socio-political context where sanism is gaining ground as a movement."
https://en.wikipedia.org/wiki/Mentalism (discrimination).

[15] Dkt #4 - Exhibit 4 –Report of Proceeding 11/9/2012 pp. 23 Line 22-25 thru pp. 24 line 1-23.

**Fact 5:** The Judicial Defendants have an egalitarian[16] duty, and responsibility to ensure judicial "due process" and "equal protection" under the law, including the rights citizens with mental and behavioral health disabilities.

**Discussion:** In this age of civil rights "Change" and leadership transparency, a comparative analysis of Ms. Grant's judicial process, reveals covert discrimination or institutional Mentalism or Sanism - reflective of 1970-200 post-civil rights covert institutional race related issues.

**Argument:** Termination of structural and individual mental illness discrimination, in Washington States Judical Systems; requires Federal Court intervention.

**Remedy:** Implementing systematic mental health civil right restructure changes, equivalent to the legal actions implement in terminating racial, age, sex, gender, and other forms of protected –class civil rights violations; since the signing of the 1964 Civil Rights Act.

**Issue 2:** To determine whether Judicial Defendant's legal process, facilitates disparities for Pro Se Litigants and individuals, with Mental Health Disabilities, through court inaccessible judicial practices; whether Ms. Grant was denied her 14th Amendment "equal protection" and "due process" civil rights; and  whether Judicial Defendants disregarded case "factual and

_____

[16]Egalitarian- "Doctrines maintain that all humans are equal in fundamental worth or social status, according to the *Stanford Encyclopedia of Philosophy*.[5] According to the Merriam-Webster Dictionary, the term has two distinct definitions in modern English:[6] either as a political doctrine that all people should be treated as equals and have the same political, economic, social, and civil rights;[7] or as a social philosophy advocating the removal of economic inequalities among people, economic egalitarianism, or the decentralization of power. Some sources define egalitarianism as the point of view that equality reflects the natural state of humanity." https://en.wikipedia.org/wiki/Egalitarianism.

plausible" legal standards, covered under *Ashcroft v. Iqbal*[17] - by impeding on trial rights of verbal defense, denial of reasonable mental and behavioral health ADA accommodations request; and ruling contrary facts.

**Fact 1:** November 2012 -Judge White states, he reviewed and familiarized himself with Ms. Grant's, complaint and pleadings, prior to the Medical Defendant's Summary Judgment Hearings.[18]

**Fact 2:** Ms. Grant's medical claims were supported with compete  medical recordings, letters, and documentation i.e. – Mr. Alperovich's medical or business records, proving he diagnosed Ms. Gant's  post-gastric bypass hernia in July 2009,  but provided not hernia treatment. He diagnoses mental illness, and provides mental health placation medical treatment, in addition, to his treatment for his nurse's phone misdiagnoses of "thrush." He then incorporates other Medical Defendants to assist him with mental illness medical treatment plan. February 2010, in New York, NY; Mr. Elliott Goodman, MD treats Ms. Grant's post-gastric bypass hernia, by providing the required surgical standards of care, which Mr. Alperovich neglects to perform in July 2009, when he diagnosed Mrs. Grant's post-gastric bypass hernia[19].

**Fact 3:**  Case dismissal facts, and plausibility standards remains in dispute, and Ms. Grant's medical records, are still a matter of judicial dispute and controversy.

--------------------------------------------------

[17]*Ashcroft v. Iqbal.* 129 S. Ct. 1937, 556 US 662, 173 L. Ed. 2d 868 - Supreme Court, 2009.

[18] Dkt #4 - Exhibit 4 –Report of Proceeding ["RP"] 11/9/2012 pp. 5 Lines 19 thru 24.

[19]  Dkt #4 Appeal Judges Facts: Dkt # 5 –Exhibit 8 – Court of Appeals Opinion pp. 1- FACTS- pp. 1st Paragraphs. Case Facts: Dkt# 3 – Exhibit 2 – Brief of Appellant, pp.10- 16- IV. Statement of the Case- Overview. Dkt# 6 - Exhibit 9 – Appeal Reconsideration pp. 15- Last paragraph July 13-14, 2009 to pp. 16 –1st sentence February 26, 2010.

**Fact 4:** Appeals Judges adapt the language and arguments of the Medical Defendants. They misstates[20]Ms. Grant's timelines, facts, and established medical malpractice prima facie evidence[21]  i.e. – Appeal Judges claims de novo review of the Ms. Grant's complaint, pleadings, and case hearings, yet they cite the same timelines of surgical diagnoses, medical treatment, and other related arguments, as stated by Medical Defendants.

**Fact 5**: In light of Ms. Grant, nonmoving party, Appeal Judges fails to consider and address her exhibits, medical and discovery timelines, and the undisputed case facts she raised in her Appellant Brief and Reconsideration Motion i.e. - Mr. Alperovich's  psychiatric placation medical treatment plan, as Washington State's standard of care for a post-gastric bypass hernia.

**Fact 6:** In light of Ms. Grant, the nonmoving party, Appeals Judges failed in their duties to consider her, competent medical evidence, supporting her misdiagnosis medical claims of "psychiatric placation medical care." These judges fails to acknowledge that "psychiatric placation" is **not the standard of care for a diagnosed post gastric-by pass hernia,** as reflected in court records.

**Fact 7:**  Judicial Defendants fails to consider or explain away Ms. Grant's claims of medical negligence - Medical Defendants neglecting their duty to read her medical records, and provide required the Washington State's standards of post gastric bypass standards of care, as directed by Ms. Grant's informed surgical consent form, a require document file in her surgical medical records [22].

_____

[20]Dkt # 5 –Exhibit 8 – Court of Appeals Opinion pp. 1- FACTS- pp. 1st Paragraphs.

[21] Dkt# 6 - Exhibit 9 – Appeal Reconsideration pp. 15- Last paragraph July 13-14, 2009 to pp. 16 –1st sentence February 26, 2010.

[22] Dkt #6 - Exhibit 9 – Appeal Reconsideration pp. 8 – 3rd and 4th paragraph and Exhibit 5.

**Fact 8:** November 9, 2012, Superior Court's Report of the Hearing Transcripts reveals - Judge White's admissions, of his deliberately cutting of Ms. Grant's defense communication, and stating, he did not want argument, establishing he was not interested in what she had to say.. Court records establishes him not interrupting the arguments, he was accepting from the numerous legal representatives, in addition to taking testimony from Mr. Yoshia, an attorney whose non-oral hearing – was held on October 29, 2012.

**Fact 9:** Ms. Grant informs the Judicial Defendants of Judge White's, judicial misconduct (nonverbal communication – signaling, gesturing, smirking, waving his hands, and other actions to avoid court recording[23]), denial of verbal representation, failure of consideration in light of her as the nonmoving party, and denial of reasonable mental health ADA accommodations request - read her written responses into court record [24].

**Fact 10:** In response to Ms. Grant's "Medical Profiling" mental illness placation medical treatment and pro se litigant complaints, Appeals Judges citing no legal authority or standards states:

> "We have no doubt that Grant was at a significant disadvantage
> because she was unrepresented and we have considered all of her examples
> in support of her claim of bias. However, after carefully examine the available
> record, we have discovered no evidence that the trial court discriminated against
> Grant because of her pro se status or for any other reason. Instead, it appears that the
> court displayed considerable patient with Grant and appropriate sensitivity to her
> position[25]".

**Fact 11:** Appeal Judges fails to acknowledge denial of Ms. Grant's  ADA accommodations request in their considering her disadvantages. These Judicial Defendants make the admission, that they knowingly, violated Ms. Grant's "equal protection" and "due

---

[23] Dkt# 3 - Exhibit 2 – Brief of Appellant, pp. 20 paragraph 5(a).
[24] Dkt #4 - Exhibit 4 –Report of Proceeding 11/9/2012 pp. 27 Lines 14 thru 24.
[25] Dkt # 5 –Exhibit 8 – Court of Appeals Opinion pp. 9 last paragraph.

process" rights covered under ADA, the 14th Amendment, and B. Platsky v. CIA,  953 F.2d  25, 26 28 (2nd Cir. 199)[26.]

**Fact 12:** Appeals Judges allows a reconsideration motion. Ms. Grant, through court records and citing state and federal authority; supports her right of court entry and relief from: 1) Rush to Summary Judgments, 2) Undue Burden and Denied Court Access, 3) Constitutionality and Vagueness ProSe Litigant –Attorney Same Standards,  and 4) Structural Mental Illness Stigma (Discrimination) judicial process that subjected her to disparity treatment. Judicial Defendants upholds case dismissals, without explanation[27], and award Medical Defendant's legal fees.

**Discussion**: Adding insult to injury, Ms. Grant brings to light that Judicial Defendant's legal process, raises an infinite number of unanswered civil rights violation questions, due to the approvals of racial, pro se litigant, and mental health related disparities.

**Argument:** Mental health disabilities does not always equate to ignorance, out-of-touch with reality, or the inability to recognize deception, abuse of authority, and mistreatment. By upholding the actions of Judge White - State and Judicial Defendants allowed and approved, Ms. Grant's subjection, to a judicial process tantamount to a Kangaroo Court[28].

_____

[26]"Court errs if court dismisses pro se litigant without instruction of how pleadings are deficient and how to repair pleadings." *B. Platsky v. CIA*, 953 F.2d 25, 26 28 (2nd Cir. 1991).

[27] Dkt#s 6 &7 - Exhibit 9 – Court of Appeals – Reconsideration (Responsive) Brief and Declaration.

[28]Kangroo Court – "[I]s a judicial tribunal or assembly that blatantly disregards recognized standards of law or justice, and often carries little or no official standing in the territory within which it resides. Merriam-Webster defines it as a "mock trial in which the principles of law and justice are disregarded or perverted".[1] The term may also apply to a court held by a legitimate judicial authority who intentionally disregards the court's legal or ethical obligations. A kangaroo court is often held to give the appearance of a fair and just trial, even though the verdict has in reality already been decided before the trial has begun." https://en.wikipedia.org/wiki/Kangaroo_court.

**Remedy:** Have State and Judicial Defendants appear and answer Ms. Grant's civil rights violations – tortfeasors- claims. In a separate cause of action, have the Medical Defendants appear before this said court and answer Ms. Grant's medical malpractice and neglect claims.

## B. Judicial Ruling Contravention of Federal and State Laws:

**Issue 1:** To determine whether Washington State's local practice, Pro Se Litigant - Attorney "Same Standards," is an unconstitutional, ungoverned local practice, and a direct contravention to federal civil rights equal protection laws:

**Fact 1:** In review of November 2012, Report of the Proceedings ,[29] Judge White implemented  "Pro Se Litigant –Attorney Same Standards**",** without providing Ms. Grant the benefit of knowledge (definitions, demonstrations, or illustrations) to comprehend and apply this legal standard. Appeals Judges rationalizes and defends Judge White's actions; the State Supreme Court strikes her compliant - upholding this form of local practice.

**Fact 2:**  Although Ms. Grant raises questions of unconstitutionality and contravention of federal laws, and unjust rulings, neither the Appeals Judges, nor the Supreme Justices address these issues. The "Pro Se Litigant - Attorney Same Standards" local practice, starkly contrast the civil right rulings of, "less stringent standards" *Haines v. Kerner,* 404 U. S. 519, 520 (1972), and "not held to the same high standards of perfection as lawyers." *Jenkins v.McKeithen*, 395 U.S. 411, 421 (1959); *Picking v. Pennsylvania* R. Co., 151 Fed 2nd 240; *Pucket v. Cox*, 456 2nd 233[30].

---

[29] Dkt #4 - Exhibit 4 –Report of Proceeding 11/9/2012.

[30] It is settled law that the allegations of such a complaint, "however in artfully pleaded" are held "to less stringent standards than formal pleadings drafted by lawyers . . ." *Haines* v. *Kerner,* 404 U. S. 519, 520 (1972). See also *Maclin* v. *Paulson,* 627 F. 2d 83, 86 (CA7 1980); *French* v. 10*10*Heyne,* 547 F. 2d 994, 996 (CA7 1976). Such a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Haines, supra,*at 520-521.[7] And, of course, the allegations of the complaint are generally taken as true for purposes of a motion to dismiss. *Cruz* v. *Beto,* 405 U. S. 319, 322 (1972).

**Fact 3:** Appeals Judges justified their use of this "local practice", despite rulings of *Davis v. Wechler*, 263 U.S. 22, 24; *Stromberb v. California*, 283 U.S. 359; *NAACP v. Alabama*, 375 U.S. 449,[31] while "raising barriers" to deny Ms. Grant court entry, covered under *Maty v. Grasselli Chemical Co.*, 303 U.S. 197 (1938). [32]

**Fact 4:** Judicial Defendants dismiss Ms. Grant's case with prejudice, without benefits of pleading instructions, deficiencies, and the opportunity of repair. *B. Platsky v. CIA,* 953 F.2d 25, 26 28 (2nd Cir. 1991)[33], nor the dismissal standards of P*utman v. Wenatchee Valley Medical Center*, 216 P. 3d 374 - Wash: Supreme Court 2009[34].

_____

[31]"The assertion of federal rights, when plainly and reasonably made, are not to be defeated under the name of local practice." *Davis v. Wechler*, 263 U.S. 22, 24; *Stromberb v. California,* 283 U.S. 359; NAACP v. Alabama, 375 U.S. 449.

[32]"Pleadings are intended to serve as a means of arriving at fair and just settlements of controversies between litigants. They should not raise barriers, which prevent the achievement of that end. Proper pleading is important, but its importance consists in its effectiveness as a means to accomplish the end of a just judgment." *Maty v. Grasselli Chemical Co.*, 303 U.S. 197 (1938).

[33] "Court errs if court dismisses pro se litigant without instruction of how pleadings are deficient and how to repair pleadings *B. Platsky v. CIA*, 953 F.2d 25, 26 28 (2nd Cir. 1991).

[34] The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803). The people have a right of access to courts; indeed, it is "the bedrock foundation upon which rest all the people's rights and obligations." *John Doe v. Puget Sound Blood Ctr.,* 117 Wash.2d 772, 780, 819 P.2d 370 (1991). This right of access to courts "includes the right of discovery authorized by the civil rules." *Id.* As we have said before, "[i]t is common legal knowledge that extensive discovery is necessary to effectively pursue either a plaintiff's claim or a defendant's defense." *Id.* at 782, 819 P.2d 370. P*utman v. Wenatchee Valley Medical Center*, 216 P. 3d 374 - Wash: Supreme Court 2009.

**Fact 5:** In her Appeal Reconsideration Motions, Ms. Grant provides creditable evidence of failed "standards of care" and medical neglect [35].

**Discussion:** The local practice of "Pro Se Litigant –Attorney Same Standards", applied without written or verbal definition and instructions – is an unconstitutional vague, generalized, and ungoverned application of the law. The implementation and approval of this local judicial practices, epitomizes abuse of authority and public trust. Additionally, this local practice identifies a closed lawyer-orientated judicial structure, with controversial negative political influences, covert individual and structural discrimination, and no public transparency. This is approved, discrimination as you "Will" system, operating freely - within the Washington State judiciary.

**Argument:** The Judicial Defendant's approval and implementation of" Pro Se Litigant – Attorney Same Standards" local legal practices, creates a serious Superior Court litigant disparity; favoring civil cases for those who can obtain or afford legal representation.

**Remedy:** Federal mandated comprehensive civil rights disparity studies of the Washington State judicial practices – examining the impact of this local practice, as it affects Pro Se litigants (Civil and Criminal) appearing before their Superior, Appeals, and Supreme Courts.

_____

[35] Plaintiffs Informed Surgical Consent - See docket #7 Exhibit #9 - Court of Appeals – Reconsideration (Responsive) Brief- Page #8 paragraph #3, and Declaration- Exhibit #5: Medical Defendants St. Francis Hospital and Claudio Alperovich, MD - Medical of "Informed Surgical Consent" as highlighted identifies "Gastric Hernias" as a post-surgical side effect requiring the surgical correction. Plaintiff's judicial process is replete with medical timelines of the July 2009 discovery, November-December 2009 surgical recommendations and denials, and February 2010 hernia correction surgery.

**Issue 2:**  To determine whether Washington State's previously stricken and unconstitutional "Medical Malpractice Certificate of Merit" court entry requirements, covered under  P*utman v. Wenatchee Valley Medical Center*[36], synonymously replaced by their application of the "Medical Malpractice Expert Witness Affidavit" for court entry; Whether the discovery period, given to Ms. Grant, for the attainment of this affidavit is unconstitutional; Whether Ms. Grant presenting an affidavit - letter at the time of her summary judgment hearing was timely; and Whether Judicial Defendant's demands for medical malpractice affidavit, unduly burdened Ms. Grant and her Expert Witness.

**Fact 1:** Ms. Grant appeared before the Judicial Defendants, with medical evidence and numerous correspondences, supporting her allegations of medical malpractice, neglect, fraud, and conspiring. These complaints, when taken together, contributed to months of  her suffering from excruciating pain, physical weakness, and feeding tubes survival. Medical Defendant's negligence to duty resulted in serious harm – Permanent oral neuropathy, financial and educational setbacks and debt respectfully, in addition to deny of disability medical clearances.

**Fact 2:** Judicial Defendants ignored Ms. Grant's case evidence, meeting the required legal "factual patterns" that are of controversy and in dispute. The serious nature of her pleadings, arguments, and claims warrant court entry standards, as covered under *Maty v. Grasselli Chemical Co*., 303 U.S. 197 (1938)[37].

---

[36]" RCW 7.70.150 unduly burdens the right of medical malpractice plaintiffs to conduct discovery and, therefore, violates their right to access courts. In addition, RCW 380*380 7.70.150 changes the procedures for filing pleadings in a lawsuit, thereby jeopardizing the court's power to set court procedures. When the activity of one branch invades the prerogatives of another, there is a violation of the doctrine of separation of powers. The court must strike down this law because it violates the right of access to courts and conflicts with the judiciary's inherent power to set court procedures. We reverse the trial court's dismissal and remand for further proceedings". P*utman v. Wenatchee Valley Medical Center*, 216 P. 3d 374 - Wash: Supreme Court 2009.

[37] "Pleadings are intended to serve as a means of arriving at fair and just settlements of controversies between litigants. They should not raise barriers, which prevent the achievement of that end. Proper pleading is important, but its importance consists in its effectiveness as a means to accomplish the end of a just judgment." *Maty v. Grasselli Chemical Co*., 303 U.S. 197 (1938).

**Fact 3:** Ms. Grant's Expert Witness, Elliott Goodman, MD has over 27-years of surgical experience, a bariatric center-of-excellence certified surgeon, with surgical specialties in weight loss and hernia repair. Mr. Goodman provided Ms. Grant with the required standards of care. In February 2010, Mr. Goodman surgically corrected Mr. Alperovich's , July 2009, diagnosed post gastric bypass hernia.

**Fact 4:** Mr. Goodman provided expert opinions on post-gastric bypass hernia standards of care, without the benefits of reviewing Washington States standards of care legal authorities. His medical expertise and experience was within the standards, cited by the Appeal Judges, and covered under P*utman v. Wenatchee Valley Medical Center.* Additionally, Mr. Goodman, as and Ms. Grant verified "mental illness placation treatment" is not a required standard of care in treating her hernia. Medical Defendants have not argued or proved that "psychiatric placation treatment" is Washington State's standard of care for post gastric-by treatment.

**Fact 5:** Mr. Elliot's, Expert Witness medical status and testimony, met the equivalent standards of Washington State's, unconstitutional and stricken RCW 7.70.150 (2)(3)38; the Judicial Defendant's prima facie requirements, for Ms. Grant's medical malpractice right of court entry [39].

**Fact 6:** Ms. Grant's summary judgment dismissals, rested on untimeliness and unsworn Expert Witness Affidavit, with less than 30-days discovery. Appeal Judges, in an effort to get around the legal authority of *Putman v. Wenatchee Valley Medical Center* [40], added additional legal standards, without supportive legal authority.

---

[38] Washington States Certificate of Merit RCW 7.70.150  (2) The certificate of merit must be executed by a health care provider who meets the qualifications of an expert in the action. If there is more than one defendant in the action, the person commencing the action must file a certificate of merit for each defendant.(3) The certificate of merit must contain a statement that the person executing the certificate of merit believes, based on the information known at the time

of executing the certificate of merit, that there is a reasonable probability that the defendant's conduct did not follow the accepted standard of care required to be exercised by the defendant.

[39] Dkt # 5 –Exhibit 8 – Court of Appeals Opinion pp. 5 Last paragraph and pp. 6.

[40] P*utman v. Wenatchee Valley Medical Center*, 216 P. 3d 374 - Wash: Supreme Court 2009, states:

 "Requiring medical malpractice plaintiffs to submit a certificate prior to discovery hinders their right of access to courts. Through the discovery process, plaintiffs uncover the evidence necessary to pursue their claims. *Id.* Obtaining the evidence necessary to obtain a certificate of merit may not be possible prior to discovery, when health care workers can be interviewed and procedural manuals reviewed. Requiring plaintiffs to submit evidence supporting their claims prior to the discovery process violates the plaintiffs' right of access to courts. It is the duty of the courts to administer justice by protecting the legal rights and enforcing the legal obligations of the people. *Id.* at 780, 819 P.2d 370. Accordingly, we must strike down this law."

"Medical malpractice claims are fundamentally negligence claims, rooted in the common law tradition. See, e.g., Wright v. Cent. Du Page Hosp. Ass'n, 63 Ill.2d 313, 327, 347 N.E.2d 736 (1976). While the legislature has made some changes to medical malpractice claims, it has not extinguished the common law action and replaced it with a statutory remedy. Cf. Lane v. Dep't of Labor & Indus., 21 Wash.2d 420, 428, 151 P.2d 440 (1944) (holding that the workers' compensation act "took away from the workman his common-law right of action for negligence" and "[i]n its place it provided for industrial insurance," thereby "creating the right of the workman to compensation" from the workers' compensation fund). Therefore, under the standard described above, medical malpractice suits do not qualify as special proceedings and are not exempt from the civil rules under CR 81(a). "

RCW 7.70.150 requires plaintiffs in medical malpractice actions to file a certificate of merit with the pleadings The certificate of merit must contain a statement from an expert that, "based on the information known at the time of executing the certificate of merit, ... there is a reasonable probability that the defendant's conduct did not follow the accepted standard of care." RCW 7.70.150(3).

"This requirement directly conflicts with CR 11, which states that attorneys do not have to verify pleadings in medical malpractice actions, as well as CR 8,  which details our system of notice pleading. First, RCW 7.70.150 conflicts with CR 11 because it requires the attorney to submit additional verification of the pleadings — a requirement that CR 11 explicitly limits to "dissolution of marriage, separation, declarations concerning the validity of a marriage, custody, and [related modifications]." CR 11(a). Second, RCW 7.70.150 conflicts with CR 8 and our system of notice pleading, which requires only "a short and plain statement of the claim" and a demand for relief in order to file a lawsuit. CR 8(a). Under notice pleading, plaintiffs use the discovery process to uncover the evidence necessary to pursue their claims. *Doe*, 117 Wash.2d at 782, 819 P.2d 370. The certificate of merit requirement essentially requires plaintiffs to submit evidence supporting their claims before they even have an opportunity to conduct discovery and obtain such evidence. For that reason, the certificate of merit requirement fundamentally conflicts with the civil rules regarding notice pleading — one of the primary components of our justice system".

**Fact 7:** Appeals Judge's additional legal standards, did not account for the rule 56 standard, "in light of the nonmoving" party considerations standards - protecting Ms. Grant's rights were violated: 1) Judge White denied her right of verbal communication, reasonable mental health ADA accommodations request; 2) Pre-hearing written pleadings of less than 30-days discovery, and denial of production of document requests; 3) King County Court -pre-trial pleadings and defenses rules, covering hearings i.e. Summary Judgments - allowing her final responses to the nonmoving party to come at time of hearing;

4) Ms. Grant cited *Putman v. Wenatchee Valley Medical Center*, in arguing the constitutionality of judicial defendant's "Expert Witness Affidavit" court entry, and less than 30-days discovery. In a "Good Faith" effort, she submits her post-gastric bypass surgeon and Expert Witness Affidavit, supporting the required case "factual pattern" legal standards. In addition, she to demonstrated that she has and can further meet her legal burdens, beyond mere accusation or bald-face claims; and 5) Considerations of cost and other undue burdens, placed on Ms. Grant and Mr. Goodman, working long distant with Ms. Grant was also under duress, due the medical and economic crisis of Hurricane Sandy[41].

---

[41] "New York was severely affected by Hurricane Sandy in 2012, particularly New York City, its suburbs, and Long Island. Sandy's impacts included the flooding of the New York City Subway system,[2] many suburban communities,[3] and all road tunnels ntering Manhattan except the Lincoln Tunnel, and the closure of the New York Stock Exchange for two consecutive days. Numerous homes and businesses were destroyed by fire, including over 100 homes in Breezy Point, Queens. Large parts of the city and surrounding areas lost electricity for several days, and several thousand people in midtown Manhattan were evacuated for six days… . Bellevue Hospital Center and a few other large hospitals were closed and evacuated. At least 53 people died in New York… Thousands of homes and an estimated 250,000 vehicles were destroyed …[5] Economic losses across New York were estimated to be at least $18 billion." https://en.wikipedia.org/wiki/Effects_of_Hurricane_Sandy_in_New_York.

**Fact 8:** November 2012, Superior Court's "Report of the Proceedings", six legal representatives without interruption from Judge White, were allowed to present their arguments. Ms. Grant did not have an opportunity to separately refute, reveal false, and generalizes claims , i.e. "extensive written  discovery", " her case had been pending for some time"[42],  and other bald-faced and unsubstantiated claims by Medical Defendants. Medical Defendant's arguments, were pretext defenses to get around Ms. Grant's pre-trails arguments, entailing her to a right of court entry, covered under P*utman v. Wenatchee Valley Medical Center*, 216 P. 3d 374.

**Fact 9:** Judicial Defendants, adopted the Medical Defendant's arguments. They ignored Ms. Grant's pre-trail pleadings, courtroom denials, and other clear violations of her 14th Amendement "due process" and "equal protection" rights. These Defendants created barriers to court entry, in defiance of  *Maty v. Grasselli Chemical Co*., 303 U.S. 197 (1938) [43].

**Fact 10:** P*utman v. Wenatchee Valley Medical Center* states "extensive" discovery, not "some" discovery, and neither federal nor state discovery laws, allow denial of  production of document requests, pending summary judgment rulings, as Ms. Grant repeatedly reported this discovery violation to the Judicial Defendants.

**Discussion:** The rulings of *Putman v. Wenatchee Valley Medical Center identified* unconstitutional court entry denials, i.e. a medical professional giving testimony or certifying medical information, prior to the benefits of courts entry discovery. Allowing court access for "extensive discovery" equates to a larger time than "some discovery" of 30 days or less.

---

[42] Dkt #4 - Exhibit 4 –Report of Proceeding 11/9/2012 pp. 8 Lines 9 thru 14.

[43]"Pleadings are intended to serve as a means of arriving at fair and just settlements of controversies between litigants. They should not raise barriers, which prevent the achievement of that end. Proper pleading is important, but its importance consists in its effectiveness as a means to accomplish the end of a just judgment." *Maty v. Grasselli Chemical Co*., 303 U.S. 197 (1938).

**Argument:** With the exception of 45-days to make discovery, and 30-days of "some" discovery; the legal standards for the "Expert Witness Affidavit," as applied by the Judicial Defendants, denying Ms. Grant court entry - are the same standards of Washington State's previously stricken "Medical Malpractice Certificate of Merit". In applying the legal standards of *Putman v. Wenatchee Valley Medical Center*, as used against Ms. Grant, both documents unconstitutionally denies the right of court entry, and discovery in a medical malpractice claims.

**Remedy:** Federal rulings on the constitutionality of the Judicial Defendant's, requirement of Ms. Grant's Expert Witness Affidavit, in addition to federally mandated disparity studies as this standard is required of the represented and unrepresented parties, appearing with medical malpractice claims in King County and Washington State's Superior courts.

Federal rulings and governing guidelines on what constitutes "extensive" and "some" discovery, in meeting medical malpractice discovery prima facie; for pro se litigants, defending medical malpractice claims.

Award Ms. Grant all her Washington State Court cost, printing cost, expenses, legal fees and Judicial Defendant's award of Medical Defendants legal fees. Additionally, award of all cost costs, expenses, etc., pertaining to Ms. Grant's appearance before this said court.

Hear Ms. Grant's medical malpractice complaints; against the Medical Defendants in this said court- allowing her a discovery period between 1 to 3 years- accounting for the hearings to address attorney legal games and dilatory practices. [44]

_____

[44]"Due to sloth, inattention or desire to seize tactical advantage, lawyers have long engaged in dilatory practices... the glacial pace of much litigation breeds frustration with the Federal Courts and ultimately, disrespect for the law." Roadway Express v. Pipe, 447 U.S. 752 at 757 (1982).

**Issue 3:** To determine whether judicial defendant's rule 56, Summary Judgment case dismissals, violates federal and state legal standards of *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.* 475 US 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 - Supreme Court, 1986, *Anderson v. Liberty Lobby, Inc.* 477 US 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 - Supreme Court, 1986, *Celotex Corp. v. Catrett* 477 US 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 - Supreme Court, 1986, and *Neitzke v. Williams* 490 US 319, 109 S. Ct. 1827, 104 L. Ed. 2d 338 - Supreme Court, 1989, thus denying Ms. Grant's right "due process" and "equal protection" under the law:

**Fact 1:** Ms. Grant submits her discovery timeline revealing her "meniscal discovery period" [1]. Throughout her costly court pleadings, Ms. Grant informs the Judicial Defendants that answers to her interrogatories and admissions were partial or not answered. Her production defendant's policies, practice, procedures, and governing guidelines, were met with denials pending scheduled hearing outcomes, or non-responses, by the Medical Defendants.

**Fact 2:** Ms. Grant's medical records, submissions, and pleadings establishes "indisputable" factual patterns, of mental and behavioral health "Medical Profiling" – "psychiatric placation medical treatment" argued as "a standard of care" for a post-gastric bypass surgery hernia.

**Fact 3:** Ms. Grant's "Surgical Informed Consent" form indisputably states, surgery is the required, standard of care for a post-gastric bypass hernia[46]. Medical Defendants diagnoses Ms. Grant's hernia, fails to render her hernia medical treatment , subjects her to months of excruciating pain, intravenous feeding, bed confinement, and mental hell.

---

[45] Dkt #6 - Exhibit 9 – Appeal Reconsideration Motion pp. 14-15.

[46] "Indisputably absent any factual or legal basis' "for the wrong asserted in the complaint, the trial court, in a close case, should permit the claim to proceed at least to the point where responsive pleadings are required. *Neitzke v. Williams* 490 US 319, 109 S. Ct. 1827, 104 L. Ed. 2d 338 - Supreme Court, 1989.

**Fact 4:** Before, during and after the Medical Defendant's Rule 56, Summary Judgment Hearing - Ms. Grant, the nonmoving party, came forward with" 'specific facts showing that there is a *genuine issue for trial'"*; supported by a plethora of "genuine issues of material facts" that remain disputed controversy, between the parties. Judicial Defendants granted and upheld, with prejudice case dismissals, giving Medical Defendants relief on a" simply show that there [may be] some metaphysical doubt as to the material facts [ Ms. Grant established and continues to establish]." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 US 574 - Supreme Court 1986[47].

**Fact 5**: Judicial Defendant's "Expert Witness Affidavit," Rule 56, Summary Judgment case dismissals, were "trial on affidavits" and technicalities. Judicial Defendants' rulings did not withstand Ms. Grant's, nonmoving party, "genuine material facts", and when taken with her evidence, she met the "reasonable jury could return a verdict for the nonmoving party" legal standards, as covered under *Anderson v. Liberty Lobby,* Inc. [48]

**Fact 6:** Judicial Defendants, incorporated "judicial disbelief," through the stigma of mental illness and bias confirmation, by attacking Ms. Grant's "legitimate inferences", "creditability" and "psychiatric placation medical treatment" claims. "Credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.*

_____

[47] *Matsushita Elec. Industrial Co. v. Zenith Radio Corp*., 475 US 574 - Supreme Court 1986 states:

"To survive petitioners' motion for summary judgment, respondents must establish that there is a genuine issue of material…"

Second, the issue of fact must be "genuine." Fed. Rules Civ. Proc. 56(c), (e). When the moving party has carried its burden under Rule 56(c),  its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. See DeLuca v. Atlantic Refining Co., 176 F. 2d 421, 423 (CA2 1949) (L. Hand, J.), cert. denied, 338 U. S. 943 (1950); 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2727 (1983); Clark, Special Problems 587*587 in Drafting and Interpreting Procedural Codes and Rules, 3 Vand. L. Rev. 493, 504-505 (1950). Cf.Sartor v. Arkansas Natural Gas Corp., 321 U. S. 620, 627 (1944). In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial*." Fed. Rule Civ. Proc. 56(e) (emphasis added). See also Advisory Committee Note to 1963 Amendment of Fed. Rule Civ. Proc. 56(e), 28 U. S. C. App., p. 626 (purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial").

[48] *Anderson v. Liberty Lobby, Inc*., 477 US 242 - Supreme Court 1986 states:
"More important for present purposes, summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

"Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact
"[I]t is true that the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." 391 U. S., at 288-289".

"Our holding that the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions does not denigrate the role of the jury. It by no means authorizes trial on affidavits. Credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. Adickes, 398 U. S., at 158-159. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial. *Kennedy v. Silas Mason Co*., 334 U. S. 249 (1948)".

**Discussion:** Judicial Defendant's rulings and opinions, established a "lack of objectivity," when examined through the preponderance of Ms. Grant's evidence, pleadings, and Expert Witness Affidavits, upholding Medical Defendant's Summary Judgment case dismissals, misstatements of established case facts, striking of her complaint and Supreme Court Petition, are all rulings contravention of federal and state laws; regarding "genuine materials of fact." Ms. Grant is demonstrating, to this said court that the Judicial Defendants violating legal standards, of Rule 56[49], their Judicial Canons[50], and _Celotex Corp. v. Catrett_ 477 US 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 - Supreme Court states[51].

**Remedy:** Open federal courts to Ms. Grant's private right of action, against Judicial and State Defendants, serving in their individual and official capacity "for violations of federal constitutional or statutory rights committed in the course of [their] official duties", arising out of their official acts as covered under 42 U.S.C. § 1983[52], and Under 42 U.S.C. American Disabilities Act, Title II, V-Exparte Young[53]- mental and behavioral health individual[54], structural, or institutionalized[55].

_____

[49] "Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis".

[50] American Bar Association Judicial Canons:
CANON 1 -A judge shall uphold and promote the, independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.

CANON 2 -A judge shall perform the duties of judicial office impartially, competently, and diligently.

CANON 3- A judge shall conduct the judge's personal and extrajudicial activities to minimize the risk of conflict with the obligations of judicial office.

[51] *Celotex Corp. v. Catrett* 477 US 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 - Supreme Court states:

"[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim. On the contrary, Rule 56(c), which refers to "the affidavits, *if any*" (emphasis added), suggests the absence of such a requirement. And if there were any doubt about the meaning of Rule 56(c) in this regard, such doubt is clearly removed by Rules 56(a) and (b), which provide that claimants and defendants, respectively, may move for summary judgment *"with or without supporting affidavits"* (emphasis added). The import of these subsections is that, regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied. One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported 324*324 claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose".

"But as we have already explained, a motion for summary judgment may be made pursuant to Rule 56 "with or without supporting affidavits." In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial".

"The Federal Rules of Civil Procedure have for almost 50 years authorized motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact. Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action."

[52] "State officials may be sued for damages in their *individual capacity* for violations of federal constitutional or statutory rights committed in the course of official duties but are entitled to claim qualified immunity. The Fourth Circuit held in *Lizzi v. Alexander*, 255 F.3d 128, 137-38 (4th Cir. 2001), *cert. denied sub nom. Lizzi v. Washington Metropolitan Area Transit Authority*, 534 U.S. 1081, *reh'g denied,* 535 U.S. 952(2002), that individual capacity suits against state officials arising out of official acts may be limited to suits under 42 U.S.C. § 1983, and not to liability arising under other federal statutes, even though the statute specifically makes the state official liable. Without explanation, the court held that such suits are in fact against the state. Presumably, the court expected the state to indemnify the official for any liability. The

Second Circuit held, however, that an individual capacity suit seeking an amount of damages far exceeding the defendant's ability to pay does not transform the suit into one against the state even when the state voluntarily chooses to reimburse the official. *Huang v. Johnson*, 274 F.3d 682(2d Cir. 2001). Qualified immunity bars recovery insofar as the official's conduct "did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (emphasis added). See Robert Capistrano, *Using Section 1983 to Raise Constitutional Claims in Garden-Variety Cases*, 38 Clearinghouse Review 734, 741 (March-April 2005). Federalpracticemanual.org/node/47#17.

[53] Congress has enacted a series of laws prohibiting discrimination based on race, ethnicity, religion, gender, disability, and age. *See, e.g.,* Americans with Disabilities Act, 42 U.S.C. § 12101; Individuals with Disabilities Education Act, 20 U.S.C. § 1400; Civil Rights Act, 42 U.S.C. § 2000e; Age Discrimination in Employment Act, 29 U.S.C. §§ 621-34.  Most of these laws either contain an express provision allowing suits against states or have been interpreted to allow for such suits. *See, e.g.*, 42 U.S.C. § 2000d-7. Federalpracticemanual.org/node/47#17.

Private parties may not sue a state or state agency by name in federal court unless Congress validly abrogates state sovereign immunity or the state waives its immunity. *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 100 (1984).State sovereign immunity also extends to state agencies. *Id.* In determining whether an agency is entitled to Eleventh Amendment immunity, the courts consider various factors, including whether payment of a judgment resulting from the suit would come from the state treasury, the status of the agency under state law, and the agency's degree of autonomy. *Savage v. Glendale Union High Sch*ool, 343 F.3d 1036, 1040-41 (9th Cir. 2003); *Belanger v. Madera Unified School District*, 963 F.2d 248 (9th Cir. 1992), *cert. denied*, 507 U.S. 919 (1993). Although the criteria for determining what entities are entitled to claim Eleventh Amendment immunity may vary among circuits, the most important factor, at least in close cases, is whether, considering the source of the entity's funding, the payment of the judgment would come from the state. *Febres v. Camden Board of Education*, 445 F.3d 227, 229 (3d Cir. 2006). Congress invoked the right of adhering to Section 504 (1973 Rehabilitation Act) guidelines rather than adopt the new ADA guidelines. Presently, only the Executive Branch of the federal government uses the 1973 law; both the Judicial and Legislative branches of the federal government are covered by the ADA. Federalpracticemanual.org/node/47#17.

In 1974, the Supreme Court held in a case involving welfare rights that injunctive and declaratory relief against state officials does not violate the Eleventh Amendment, but that the Constitution prohibits retroactive monetary damages. *Edelman v. Jordan*, 415 U.S. 651 (1974). Subsequent cases have reaffirmed the availability of injunctive relief against state officials for violations of safety net and civil rights statutes. *See* Rochelle Bobroff, *Ex Parte Young as a Tool to Enforce Safety Net and Civil Rights Statutes*, 40 Univ. of Toledo L. Rev. 819 (2009). Federalpracticemanual.org/node/47#17.

In the context of Title II of the Americans with Disabilities Act, the Ninth Circuit rejected arguments that the Eleventh Amendment prohibits prospective relief, finding that the remedial scheme of the Americans with Disabilities Act was similar to that in *Verizon* and has repeatedly rejected the reasoning of Garcia and found that states waive sovereign immunity from suit under Section 504 if they accept federal funds. *Miranda B. v. Kitzhaber*, 328 F.3d 1181 (9th Cir. 2003); *Lovell v. Chandler*, 303 F.3d 1039 (9th Cir. 2002); *Pugliese v. Dillenberg*, No. 01-06544, 2003 U.S. App. LEXIS 20361 (9th Cir. Oct. 7, 2003) (per curiam).

The court held that Title II of the ADA's ban on discrimination by public entities and programs can be enforced through against state officials through the Ex Parte Young exception (which provides for an action against state officials in an official capacity to enjoin ongoing violations of federal law). It also held that plaintiffs' claims of discrimination in violation Section 504 of the Rehabilitation Act could be enforced through the Ex Parte Young exception. *Bruggeman* v. *Blagojevich,* No. 02-1730, 2003 U.S. App. LEXIS 6536 (7th Cir. Apr. 7, 2003).

The Court holds that Congress exceeded its authority when it attempted to abrogate states' sovereign immunity from claims under Part A of Title II of the Americans with Disabilities Act. Part A of Title II of the ADA prohibits discrimination in public services. *Wesel v. Glendening*, 306 F.3d 203 (4th Cir. 2002).

The court holds that: (1) Pennsylvania waived Eleventh Amendment immunity by accepting funds under Section 504 of the Rehabilitation Act; (2) conditioning federal funds on the waiver of Eleventh Amendment immunity is not unconstitutional per se; (3) the conditions imposed upon acceptance of funds do not abridge the Spending Clause; (4) federal claims for prospective injunctive relief against state officials under the ADA are authorized by Ex Parte Young. *Koslow v. Commonwealth of Pennsylvania*, 302 F.3d 461 (3rd Cir. 2002).

The court held that Congress validly abrogated the states' sovereign immunity in passing Title II of the ADA and that Hawaii had waived its sovereign immunity when it accepted funds under the Rehabilitation Act.  *Lovell v. Chandler*, 2002 303 F.3d 1039 (9th Cir. 2002).

Whenever a court considers sovereign immunity vis-à-vis the ADA, they will look at three factors per *City of Boerne v. Flores*, 521 U.S. 507 (1997): 1) The constitutional right(s) Congress sought to enforce in enacting the ADA; 2) whether there is a history of unconstitutional discrimination to support Congress's determination that prophylactic legislation was necessary; and 3) whether title II of the ADA was an appropriate response to that history and pattern of unequal treatment. *TENNESSEE v. LANE (* No. 02-1667 *)* 315 F. 3d 680, affirmed.

Title II of the Americans with Disabilities Act of 1990 (ADA or Act), 104 Stat. 337, 42 U. S. C. §§ 12131-12165, provides that "no qualified individual with a disability shall, by reason of

such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." § 12132. The question presented in this case is whether Title II exceeds Congress' power under § 5 of the Fourteenth Amendment. *Tennessee 5*41 US 509, 124 S. Ct. 1978, 158 L. Ed. 2d 820 - Supreme Court, 2004.

Under *Ex parte Young*, private parties can sue state officials in their *official capacity* to enforce federal laws and regulations, but only for prospective injunctive and declaratory relief. *Ex parte Young,* 209 U.S. 123 (1908); *see Virginia Office for Protection and Advocacy v. Stewart*, 131 U.S. 1632 (2011) (Virginia Office for Protection and Advocacy's status as an independent state agency, which sued for records of another state entity, is irrelevant to the *Young* analysis). *See* Bobroff, *Ex Parte Young*, *supra* note 8.Accordingly, there must be an ongoing violation of federal law to support prospective relief. *Green v. Mansour*, 474 U.S. 64 (1985). *Edelman v. Jordan*, 415 U.S. 651 (1974). Such relief may include notice to the plaintiff class of the availability of remedies under state law. No damages are recoverable in *Ex parte Young* suits, but prospective relief may require the incidental expenditure of state funds. *Milliken v. Bradley*, 433 U.S. 267 (1977). The Sixth Circuit has held that the Eleventh Amendment does not permit a prospective injunction that amounts to a direct monetary award. See *Ernst v. Rising*, 427 F.3d 351, 371 (6th Cir. 2005) ("[A] request that plaintiffs [district court judges] receive a higher pension benefit in the future not only compels greater state contributions in the future but also will compel other transfers of state funds to account for the lack of adequate contributions in the past."). http://federalpracticemanual.org/node/47.

[54] *Id.* See Footnote 12.
[55] *Id.* See Footnote 13.

### C. White Washing[56]- Judicial and Political Conflicts of Interest - Perception Thereof.

**Issue:** Through the preponderance of the Judicial Defendant's rulings, are in direct contravention of federal and state laws, determine whether a conflict of judicial and political interests; impacted Ms. Grant's case rulings; and whether judicial and political biasness, are also contributing factors to civil right violations of the Judicial Defendants, in the denial of justice.

**Fact 1:** Ms. Grant's complaints were allegedly heard and reviewed, by the Judicial Defendants, as follows: 2012- Superior, 2013-Appeals and 2014-Supreme Courts. She appeared before the State and Judicial Defendants, raising mental and behavioral health civil rights violations for "Medical Profiling," as contributing factors to her medical malpractice-neglect complaints. Her judicial appearances and complaints, also coincided with Seattle and Washington State investigations by U.S. Department of Justice and the national media regarding race, returning war veterans with serious mental health related issues, military sex assaults, psychiatric abuses, and other civil rights related concerns[57].

---

[56]"To whitewash is a metaphor meaning "to gloss over or cover up vices, crimes, or scandals or to exonerate by means of a perfunctory investigation or through biased presentation of data". It is especially used in the context of corporations, governments or other organizations". https://en.wikipedia.org/wiki/Whitewashing_(censorship).

[57] March 12, 2012: Is Lewis-McChord really 'most troubled base in the military'? Some have connected the March 11 massacre by a U.S. soldier to other problems at the base: a record number of suicides, several investigations into the treatment of soldiers diagnosed with post-traumatic stress disorder, a "kill team" convicted of murdering civilians for sport in Afghanistan and a string of other crimes involving present and past soldiers. http://www.mcclatchydc.com/news/nation-world/national/article24726238.html.

March 20, 2012: 40% of PTSD diagnoses at Madigan were reversed…"A Madigan Army Medical Center screening team reversed more than 40 percent of the post-traumatic stress disorder diagnoses of patients under consideration for medical retirement since 2007, according to information released by U.S. Sen. Patty Murray… Investigators so far have checked the medical evaluations of more than 1,680 patients screened. Of those patients, more than 690 had a PTSD diagnosis. The team reversed more than 290 of those diagnoses, Murray told The Seattle Times this week." http://www.seattletimes.com/seattle-news/40-of-ptsd-diagnoses-at-madigan-were-reversed/.

May 22, 2012: "AMVETS' concern comes in the wake of the Army's announcement last week that it will conduct a comprehensive, independent review of how it evaluates soldiers with possible PTSD. The latest reviews were triggered by revelations that the forensic psychiatry unit at Madigan Army Medical Center at Joint Base Lewis-McChord in Washington State may have reversed more than 290 PTSD diagnoses based on the expense of providing care and benefits to members of the military" http://usnews.nbcnews.com/_news/2012/05/22/11744723-veteran-fights-va-to-keep-ptsd-diagnosis?lite.

December 16, 2011: "…Findings of the United States Department of Justice Civil Rights Division's and United States Attorney's Office for the Western District of Washington's (collectively, "DOJ") joint investigation of the Seattle Police Department ("SPD" or "the Department"). Our investigation is brought pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141"), the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d ("Safe Streets Act"), and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI"). These laws authorize DOJ to initiate a civil lawsuit to remedy patterns or practices of conduct by law enforcement agencies that deprive individuals of rights, privileges, or immunities secured by the Constitution or laws of the United States. As we stated in our notification letter of March 31, 2011, our investigation focused on whether SPD engaged in a pattern or practice of unconstitutional policing through (1) the use of excessive force; or (2) discriminatory policing." http://www.justice.gov/sites/default/files/crt/legacy/2011/12/16/spd_findletter_12-16-11.pdf.

**Fact 2:** Medical Defendants:  Pacific Medical Centers, Inc. ("PacMed"), U.S. Family Health Plan at Pacific Medical Center ("USFHP"), and Virginia Mason Medical Centers are military insurance ("TriCare) contracted health care providers.  In 2007, PacMed recruited Ms. Grant and her family directly from Madigan Hospital, Joint Base Louis McChord ("JBLM")[58].

**Fact 3:**  Ms. Pulling, MD, a medical resource of PacMed, and allegedly an employee of the University Of Washington School Of Medicine ("UW"), are parties to Ms. Grant's legal claims. Her claims against Valley Medical Center and UW, public medical entities, place them at risk for economic loss, due the nature of Ms. Grant's discrimination allegations.

**Fact 4:**  November 2012, after Medical Defendant's  Summary Judgment Hearing, Ms. Grant exhausted her courtroom administrative remedies [59], reporting Judge White's judicial canon violations, including his special attention to Ms. Pulling's legal representative - former Washington State Medical Quality Assurance Commissioner and Special Assistant Attorney General, Douglas K. Yoshida WSBA # 17365, whose case was decided, two weeks prior.

**Fact 5:** In her Appeal Reconsideration Motion, Ms. Grant identified herself as a human and civil rights subject matter expert, by revealing that as a U.S. Southern State native, with over 30-combined years of education, military training, community, and scholarly research in the area of human civil rights – Military Personnel, Political and Community Activists, and Mental and Behavioral Health. She motioned the Appeals Judges to address, the structural discrimination issues – the nature of her case – Mental Illness Stigma. Her Reconsideration denied without explanation.

---

[58] Ms. Grant was contacted by PacMed recruiter within two weeks of her relocation to Washington State. She was informed that her contact information was taken from her emergency room visit to Madigan Hospital.

[59]Docket #4 Exhibits  #'s 4-5.

**Fact 6:** Although Ms. Grant presented facts that, her complaint was of global and national concerns, meeting their standards for publication, Ms. Grant's request for publication of the Appeal judge's decision were denied.

**Discussion:** The Judicial Defendants' rulings, barring Ms. Grant court entry to seek justice, due  the stigma and attributions of mental and behavioral health - is comparative to the South's Post-Civil Rights era of 1968-2000; a period prior today's  political, j udicial, and societal demands for transparency, responsibility, and accountability from our country's " Upper Echelon" leaders - holding positions of public trust.

During this period, structural discriminatory policies, practices, procedures, and laws governed discrimination related issues. In high profile organizational discrimination cases, strategies for getting around the law, while avoiding scandal or financial loss - minorities through political appointments, favors, etc. became the public-face or figureheads, deciding discriminatory practices. These individual's presence gave the appearance of "discrimination objectivity and racial fairness" – "White Washing", i.e. – 2991, Supreme Court Appointment Confirmation Hearings -Anita Hill vs. Clarence Thomas, an infamous case of discrimination with "white washing" related issues, comprised of two minorities in opposition of the other, and both parties, held sworn an oath of offices or positions of public trust.

Race relations, discrimination, and other scandalous subject matters are "White Washed." It does not take a person with a PhD or Ms. Grant's civil rights subject-matter expertise to recognize the discrimination components in this case - "White Washing" i.e. the minority makeup of the Judicial Defendants, and their judicial rulings that are now in controversy.

**Argument:** Judicial Defendant's rulings and court denials, were also based on racial and mental health biasness, due to the nature of Ms. Grant's complaints,  and the period that she

appeared before the Judicial Defendant's. Ms. Grant appearance before the Judicial Defendants were "White Washed", and nature of her complaint was met with "judicial disbelief and mockery".

**Remedy:** Grant federally mandated, Mental-Behavioral Health and Pro Se Litigant, and other structural human civil rights, organizational investigations, within the Washington State's Summary Judgment, and court entry requirements, as faced by Ms. Grant. Comprehensive civil rights investigations- expanding Washington State's 2014, fragmented look at the "perception of discrimination" – a snap shot of race relations from the perception of four racial groups.

### III. FINAL.

Ms. Grant is aware that she is appearing in the judicial system seeking justice for complicated and unprecedented, stigma of mental and behavioral health civil rights issues that historically viewed as covert jokes, and placation is the standard treatment of the person with this infamous mark of shame, humility, inferiority, ignorance, etc.

Although her complaints continually meets the standard of "judicial and medical disbelief," and often dismissed for many bias reasons, the lack of mental and behavioral health civil rights protection cases mandates federal intervention; enforcing mental and behavioral health civil rights laws.

Ms. Grant prayer this said court takes her compliant and subject matter seriously.

Respectfully Submitted

December 19, 2015, Olympia, WA

*Patricia A. Grant*

PATRICIA A. GRANT, PHD-PRO SE
1001 COOPER POINT RD, #140-231
OLYMPIA WA, 98502
(210) 543-2331

## CERTIFICATE OF SERVICE

I certify that December 19, 2015, I electronically filed the foregoing with the

Clerk of the United State District Court, Western District of Washington at Seattle, via the

CM/ECF system, and will mail certified copy (7014 0510 0001 1847 9525) copy,  December 21,

2015.


DATED at Olympia, Washington, this 19th day of December 2015.


PATRICIA A. GRANT, PHD-PRO SE
1001 COOPER POINT RD, #140-231
OLYMPIA WA, 98502
(210) 543-2331